# United States Court of Appeals

## For the First Circuit

No. 06-1530

UNITED STATES OF AMERICA,

Appellee,

v.

LEE HENRY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor,  U.S. District Judge]

Before

Boudin, Chief Judge

Torruella and Lynch, Circuit Judges.

John M. Thompson with whom Linda J. Thompson and Thompson & Thompson, P.C. were on brief for appellant.
Alex J. Grant, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief for appellee.

April 6, 2007

**BOUDIN, <u>Chief Judge</u>.** Lee Henry was indicted on October 23, 2003, on four counts of distribution and possession with intent to distribute heroin and cocaine base in violation of 21 U.S.C. § 841 (2000). The charges stemmed from controlled drug buys that occurred on February 6 and 26 and on May 2 and 13, 2003. The controlled drug buys were made by Carlos Ortiz, who was cooperating with the FBI, under the supervision of FBI Special Agent Robert Lewis.

In early 2004, prior to trial, Henry sought exculpatory evidence from the government, and the district court ordered the government to produce four categories of documents relating primarily to the government's contacts with and benefits supplied to Ortiz. Further evidence was sought in June 2004 (<u>e.g.</u>, drug tests and debriefing reports) and further evidence was produced. In a July 2004 hearing the court ordered the government to give yet further evidence to the defense.

On December 30, 2004, one business day before trial, Henry sought to subpoena further documents from Ortiz and Agent Lewis, with both requests asking for very broad categories of documents including material earlier furnished.[1] The district

---

[1]For example, the Ortiz subpoena sought any record of any aspect of Ortiz' dealings with the FBI and the U.S. Attorney's Office; any record or evidence of Ortiz' drug dealing and use; any record of the amount of benefits provided to Ortiz; any transcript of any of Ortiz' testimony given in any criminal proceeding; a copy of any statement given in connection with Ortiz' involvement in the investigation of Henry; any record of dealing with Section 8

court, citing delay, overbreadth and prior production, quashed the subpoena as to Ortiz and granted only limited items demanded of Lewis. A renewed request during trial was denied.

Trial began on January 3, 2005, and continued until January 13, 2005. The government offered Agent Lewis and a cooperating local law enforcement agent to testify as to the arrangements for the buys (e.g., dates, searches of Ortiz and his car before and after the buys, recording equipment). There was also identification of the drugs recovered from Ortiz after each of the transactions. Ortiz testified as to the buys themselves and identified Henry as the seller.

The pièce de résistance was the recordings of the February transactions from a concealed camera and audiotape device in Ortiz' car where the February deals occurred. In the February 26 sale, the seller could be seen and heard and exchanges of money and drugs witnessed by the jury. In a tape of a phone call also presented to the jury, the seller answers to the name "Lee," and the buyer refers to "Lee" throughout the various recordings. Despite some discrepancies (e.g., the seller had a mustache and

housing authorities; all phone records from March 2001 onward; any record of any accusation of misconduct while Ortiz served as a confidential informant and cooperating witness; and all tax returns during the time Ortiz was working with the FBI.

Henry appeared clean shaven at trial), the jury could compare the face on the video with Henry.[2]

The first May buy followed the same pattern but took place outside the car, and the main taped evidence was from audio recordings. The jury could, of course, compare voices from the first May audio with the two February audio recordings; and, in addition, although Henry did not testify at trial, Agent Lewis testified that he had heard Henry speak in person in late 2003 and that Henry's voice matched the voice on the tape.

The second May buy was also outside the car. The government offered an audiotape of a telephone conversation between Ortiz and someone at a cell phone number assigned to Henry arranging to meet near a restaurant; but, because of distortions at the noisy restaurant, the corresponding audiotape of the transaction itself was hard to make out, although the government sought to show fragments allegedly consistent with a drug deal.

The defense called no witnesses except for Agent Lewis who was recalled and subject to brief examination primarily about Ortiz' admissions of past criminal conduct. The defense did, however, bring out Ortiz' very extensive record of past criminal conduct, the benefits he received from the government, and alleged

---

[2]The February 6 recording was less complete because Ortiz partially covered up the video camera, but the audiotape was played to the jury and still frames of the video allowed the jury to see part of the defendant's face and the money change hands.

deviations from standard guidelines by Lewis or other agents in handling or compensating Ortiz.

In closing the prosecutor relied scarcely at all on Ortiz but focused heavily on the videos for the February buys and on the audio for the first May transaction. For the second May transaction, the links were the telephone call arranging the meeting and the less distinct audio-taped discussion at the transaction site. The defense closing was an energetic kitchen-sink collection of criticism of Ortiz, Lewis and the prosecution's supposed failure to prove what it had promised.

The jury, after approximately five hours of deliberation, found Henry guilty as to the first three transactions and acquitted as to the fourth (the May 13 sale, which was the one minimally recorded). The district court sentenced Henry to 144 months' imprisonment. Henry has now appealed and we have pending both his appeal from his conviction and a recent motion by Henry filed in this court seeking a remand to permit him to file in the district court a Rule 33 motion based on newly discovered evidence. Fed. R. Crim. P. 33.

On this appeal, Henry wisely does not challenge the sufficiency of the evidence against him. The first of his two sets of arguments is directed to discovery and the main contention is that the district court erred in quashing the eve-of-trial subpoena to Ortiz and limiting the similar subpoena to Lewis. A second

strand of this argument claims that alleged discovery order violations should have led to suppression of evidence.

In federal criminal trials, defense access to government evidence that is exculpatory or helpful in impeaching government witnesses is governed by a set of statutory and rule-based requirements elaborated through much doctrine. Among the most familiar are those reflected in the Jencks Act, 18 U.S.C. § 3500, Fed. R. Crim. P. 26.2, Fed. R. Crim. P. 16, and the Brady decision, Brady v. Maryland, 373 U.S. 83 (1963).

In addition, but with limitations, the defense may use subpoenas before trial to secure admissible evidence but not as a general discovery device. Fed. R. Crim. P. 17; Nixon v. United States, 418 U.S. 683 (1974); Bowman Dairy Co. v. United States, 341 U.S. 214, 218 (1951). The court has power to quash a subpoena that is unreasonable or oppressive, Fed. R. Crim. P. 17(c)(2), and review on appeal is for abuse of discretion. Nixon, 418 U.S. at 702; United States v. Lieberman, 608 F.2d 889, 904 (1st Cir. 1979).

Here, the subpoenas were not only extremely broad and unrealistic, especially as eve-of-trial demands, but the categories of information overlapped with prior demands for information. Henry's briefs do not explain just what materials had been produced by the government in response to the prior requests; but if the earlier production had been unjustifiably deficient, the

deficiencies should have been identified--and well before the last working day before trial.

In addition, practically all errors relating to discovery or the admission or exclusion of evidence require some showing of prejudice--usually, some variant on a likelihood of a different outcome if the error had not been made.  See, e.g., United States v. Castellini, 392 F.3d 35, 52 (1st Cir. 2004) (improperly admitted evidence must have "likely affected the outcome of trial").  Less is sometimes needed for constitutional error but, even there, some prejudice ordinarily is required.[3]

Most of the salient material sought both in the earlier demands by Henry and in his eve-of-trial subpoenas aimed at two targets.  Most important was material to impeach Ortiz, and understandably so since he alone had dealt with the drug supplier. But Ortiz was impeached by overwhelming evidence of his criminal past and the payments to him from the government.  The prosecution relied centrally on the videos and audiotapes.  The jury, acquitting on the last transaction, showed that it placed minimal faith in Ortiz.

---

[3]See, e.g., Chapman v. California, 386 U.S. 18, 24 (1967) (requiring harmlessness beyond a reasonable doubt).  No-prejudice reversals are ordinarily reserved for very rare errors so fundamental as to be deemed "structural error"--a somewhat ill-defined category none of whose examples approach the present case. See Neder v. United States, 527 U.S. 1, 8 (1999) (collecting examples).

The defense also sought information to show that the FBI had mishandled Ortiz, either by sloppy procedures or by failing to comply with various Justice Department guidelines for dealing with confidential informants or cooperating witnesses. Some of this information the defense received and used in evidence and in arguing to the jury; but so far as information sought aimed to impeach Ortiz, it was redundant; and the alleged violations were, as we will see, not an independent basis for suppressing evidence.

Asked by us at oral argument about the apparent lack of prejudice and the powerful taped evidence supporting the convictions, Henry's counsel said that the defense hoped to show that Agent Lewis had been careless and even untruthful as to prior dealings with Ortiz. But only two examples were offered and neither was very significant.[4] Lewis was not shown to be generally unworthy of belief, and any doubts raised about either competence or veracity could not have seriously undermined the video and audio evidence.

Henry argues that the limitations on discovery and the subpoenas constituted not only an abuse of discretion by the district court but also a violation of the Sixth Amendment, which guarantees "criminal defendants a meaningful opportunity to present

---

[4]First, Lewis was required to do a thorough suitability check on Ortiz but testified at trial to lacking background information about Ortiz. Second, Lewis testified that Ortiz told him that he was not a substance abuser when they first met, while Ortiz stated he told Agent Lewis that he had been involved in drugs.

a complete defense." Holmes v. South Carolina, 126 S. Ct. 1727, 1731 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 689-90 (1986)). Just when a restriction on discovery or admission of evidence rises to the level of a Sixth Amendment violation need not be pursued.[5] We have found nothing to indicate that the quashing was error nor, if Henry argues that the application of Rule 17 while correct was still unconstitutional, that the requisite prejudice existed. See United States v. Hughes, 895 F.2d 1135, 1145 n.15 (6th Cir. 1990).

Henry makes one other discovery-related argument, namely, that the government read an early discovery order too narrowly and that the district judge should have sanctioned the government. The argument is not adequately developed in Henry's opening brief and so is forfeit, Mass. Sch. of Law v. Am. Bar Ass'n, 142 F.3d 26, 43 (1st Cir. 1998). In any event, the judge supportably found that the government's reading was reasonable.

Henry's other main claim on appeal is that "the district court erred in admitting the evidence obtained through . . . Ortiz's commission of federal and state crimes." This interesting argument starts with a series of propositions: that the Attorney General has only doubtful power to authorize acts that constitute

---

[5]See Kyles v. Whitley, 514 U.S. 419, 434 (1995); Pennsylvania v. Ritchie, 480 U.S. 39, 56-57 (1987); United States v. Valenzuela-Bernal, 458 U.S. 858, 872-73 (1982); United States v. Theresius Filippi, 918 F.2d 244, 247-48 (1st Cir. 1990); United States v. Hoffman, 832 F.2d 1299, 1303 (1st Cir. 1987).

crimes even in aid of criminal "sting" investigations; that the authority to delegate this authority to others is even more limited; and that the FBI in this case ignored numerous restrictions in Justice Department guidelines. The remedy, Henry's brief argues, should be suppression of evidence including the tapes.

The government says that neither the lack of authority nor the guideline violation claims were adequately preserved as bases for suppression. This is quite arguably so as to the former; the latter may have been preserved. But, by-passing waiver or plain error requirements, we reject the exclusion claim on the merits. Even assuming arquendo infirmities as to authority, delegation or compliance with Justice Department guidelines, exclusion of the evidence was not warranted in this case.

Nothing here involves evidence made unreliable by government misconduct, so exclusion would serve only a deterrent value--if misconduct there were--at the cost of letting an otherwise guilty defendant go free. The Supreme Court has been willing to pay that price in the case of evidence secured by certain constitutional violations, although even in such instances it has adopted a number of qualifications. See, e.g., United States v. Leon, 468 U.S. 897, 922 (1984); Stone v. Powell, 428 U.S. 465, 493 (1976).

The Court has been far less ready to require exclusion for violations of any non-constitutional rubrics. A few supposed examples are older cases dealing with provisions designed to protect constitutional interests. E.g., McNabb v. United States, 318 U.S. 332, 347 (1943). More recently, the Court has said that the cases of suppression for statutory violations are "few," Sanchez-Llamas v. Oregon, 126 S. Ct. 2669, 2681 (2006); for obvious reasons this is even more clearly true of regulations.[6]

Similarly, this court has said that "[t]he exclusionary rule was not fashioned to vindicate a broad, general right to be free of agency action not 'authorized' by law." Hensel, 699 F.2d at 29. Judge Posner has explained why: "Exclusion confers windfalls on the guilty and therefore, at least as a device for enforcing nonconstitutional rules, is disfavored." United States v. Dawson, 425 F.3d 389, 394 (7th Cir. 2005), reh'g granted on other grounds, 434 F.3d 956, cert. denied, 127 S. Ct. 831 (2006).

There is a good deal of precedent supporting the use of sting operations in law enforcement, including drug transactions involving undercover agents or cooperating private persons;[7] and

---

[6]United States v. Caceres, 440 U.S. 741, 754-55 (1979) (IRS regulations); Buntrock v. SEC, 347 F.3d 995, 999 (7th Cir. 2003) (SEC regulations); United States v. Hensel, 699 F.2d 18, 29 (1st Cir.), cert. denied, 461 U.S. 958 (1983) (Coast Guard regulations).

[7]Hampton v. United States, 425 U.S. 484, 485 (1975) (DEA informant arranged drug deals between defendant and government agent); United States v. Russell, 411 U.S. 423, 425-26 (1973)

while undercover operations can be, and have been, abused, an exclusionary rule based on the principle that all such operations are unlawful would be an extraordinary step.

Justice Department guidelines were not compelled by statute, nor intended to create private rights. United States v. Flemmi, 225 F.3d 78, 88 (1st Cir. 2000), cert. denied, 531 U.S. 1170 (2001). Henry may be right in saying that the guidelines are underenforced, and this would be cause for concern, but that is primarily a matter for the Justice Department or, if Congress wishes, for its supervision.

We deny Henry's "motion for remand to permit filing of Rule 33 motion for new trial based on newly discovered evidence." All of the "newly discovered evidence" Henry points to would either be used to further impeach Ortiz or Lewis or to argue for the suppression of evidence. As we have already explained, impeachment of Ortiz was thoroughly accomplished and suppression of evidence on account of the way Ortiz was supervised is not appropriate.

Affirmed.

---

(undercover federal agent supplied drug component and purchased drugs from defendant); Lewis v. United States, 385 U.S. 206, 207 (1966) (undercover agent purchased drugs from defendant); United States v. Murphy, 768 F.2d 1518, 1528-29 (7th Cir. 1985), cert. denied, 475 U.S. 1012 (1986) (approving undercover sting operation targeting judicial misconduct by staging cases); United States v. Monaco, 700 F.2d 577, 580-81 (10th Cir. 1983) (approving use of cooperating witnesses working as prostitutes to obtain information); United States v. Myers, 692 F.2d 823, 847 (2d Cir. 1982), cert. denied, 461 U.S. 961 (1983) (approving Abscam sting operation).